1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| CHRISTIAN DOSCHER, pro se, | CASE NO. 3:22-cv-05340-RJB |
| Plaintiff, | ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| TIMBERLAND REGIONAL LIBRARY, an Intercounty Rural Library District, | |
| Defendant. | |

This matter comes before the Court on Defendant Timberland Regional Library's ("Library") Motion for Summary Judgment. Dkt. 45. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

Plaintiff Christian Doscher, proceeding *pro se*, brings this lawsuit against twenty-five defendants and claimed twenty-seven causes of action arising out of two incidents at the Library on September 14 and 18, 2021 related to his refusal to wear a mask over his nose and mouth during the COVID-19 pandemic. Dkt. 7. All parties except the Library have been dismissed. Dkts. 21, 37, and 38. The Library now moves for summary judgment on the remaining claims

1    asserted against it.  For the reasons provided below, the motion (Dkt. 45) should be granted and

2    this case dismissed.

3                    I.    **RELEVANT FACTS AND PROCEDURAL HISTORY**

4        **A.  FACTS**

5        On February 29, 2020, Washington State Governor Jay Inslee declared a state of emergency

6    and issued proclamations covering the next several months in an attempt to slow the spread of

7    COVID-19. www.governor.wa.gov/office-governor/official-actions/proclaimations (visited on

8    December 12, 2022).  As is relevant here, On January 5, 2021, the governor announced a new

9    phased reopening plan called "Healthy Washington – Roadmap to Recovery" which included a

10   mandatory mask mandate, with exceptions.  *Id.*  Washington State's Department of Health

11   Secretary also issued various orders, including orders requiring face coverings.

12   www.doh.wa.gov/emergencies/covid-19/masks-and-face-coverings (visited on December 12,

13   2022).

14       After a surge of COVID-19 variants (including the Delta variant) emerged in the summer of

15   2021, on August 19, 2021, the Dept. of Health issued Order 20-03.4 requiring face coverings,

16   "regardless of vaccination status, when in a place where any person from outside their household

17   is present or in a public place," with limited exceptions and exemptions.

18   Secretary_of_Health_Order_20-03_Statewide_Face_Coverings.pdf (wa.gov) (visited on

19   December 12, 2022)(filed in the record at Dkt. 46-1 at 22-25).  As is relevant here, Dept. of

20   Health Order 20-03.4 provided an exemption for "[p]eople with a medical condition . . . or

21   disability that prevents wearing a face covering . . . includ[ing], but [] not limited to, people with

22   a medical condition for whom wearing a face covering could obstruct breathing . . ." *Id.*  On

23   August 20, 2021, Washington's Governor issued Proclamation 20-25.15 "Washington Ready

24

Mask Requirement," prohibiting "any individual from failing to wear a face covering as required

by the Secretary of Health's face covering order [20-03.4] and subsequent amendments."

www.governor.wa.gov/office-governor/official-actions/proclaimations (visited on December 12,

2022)(filed in the record at Dkt. 46-1 at 15-20). The Court takes judicial notice of the Center for

Disease Control ("CDC")'s website; "neither party disputes the authenticity of the website nor

the accuracy of the information." *Kater v. Churchill Downs Inc.,* 886 F.3d 784, 788 n. 3 (9th

Cir. 2018).  Around that time, the CDC considered an "unmasked adult at an indoor place of

public accommodation to present a risk to other patrons." *See Hernandez v. Costco Wholesale

Corp.*, 2022 WL 17537981, at *2 (D. Ariz. Dec. 8, 2022).

The Library's Deputy Director, Kendra Jones states that in response to the various

governmental orders, the Library instituted a policy to exclude all patrons, age five or older,

regardless of vaccination status, who would not or could not wear masks, from the building.

Dkt. 47 at 6-7.  The Library did not inquire into why someone did not have on a mask. *Id.*  Jones

explains that to help patrons who could not or would not wear masks, the Library provided the

following accommodations: patrons could order books and have Library staff deliver them

curbside, patrons could check out the Library's chromebooks (laptops), a "Shelf Browse" feature

was offered on the online catalogue, "grab bags" were offered which allowed patrons to request a

random selection of books on a topic and those books were delivered curbside, and patrons were

permitted to use the Library's outside outlets which were under cover.  Dkt. 47 at 2-3.  The

Library did not require patrons to use masks in the restrooms (which were inside a first set of

doors but outside a second set of doors that led to the main reading room and stacks).  Dkt. 47 at

3.  The Library did not have isolated temperature-controlled rooms available to anyone.  Dkt. 47

at 5.  Meeting rooms were not open to the public at that time and staff offices are never open to the public.  *Id.*; Dkt. 52 at 4.

The Plaintiff contends that he can't wear a mask over his nose and mouth because of asthma, dyspnea (shortness of breath), and feelings of panic.  Dkt. 46-1 at 65-66.  The Plaintiff does not remember the name of the doctor who diagnosed him with asthma and has no supporting medical records of that condition.  Dkt. 46-1 at 69.  The Plaintiff also testified that he has borderline personality and functional anxiety disorders.  Dkt. 46-1 at 75. The Plaintiff maintains that he becomes "easily winded" if he walks 20 feet or more while wearing a mask over his nose and mouth.  Dkts. 46-1 at 65-67; and 50 at 3.

Starting on September 2, 2021, the Plaintiff and Library Deputy Director Jones exchanged emails about the Library's mask policy.  Dkt. 47-1 at 9-11.  The Plaintiff indicated that he felt the mask policy failed to account for people with disabilities and Jones explained that there were several accommodations offered for people who were unable or unwilling to wear a mask.  *Id.*

Sometime before September 14, 2021, the Plaintiff went to the Library and a staff member, Diane Froelich, who was at the door, informed him that he would need to wear a mask to enter. Dkt. 52 at 2. They discussed the various accommodations offered by the Library to patrons unable or unwilling to wear a mask.  *Id.*

On September 14, 2021, the Plaintiff went to the Library and, while sitting at a table inside the main area of the building, lowered his mask below his nose.  Dkt. 47-1 at 16.  Library staff approached him and asked him to raise the mask.  *Id.*; Dkt. 52 at 3. The Plaintiff declined and indicated that it was only temporary due to breathing difficulties he was having.  *Id.*  Staff checked back with him several times and the Plaintiff still did not have his mask fully on and refused to put it on claiming a medical exemption.  *Id.*  The Plaintiff then informed Library staff

that he would not leave and that they would have to call the police. *Id.* The Library staff finally did call the police and after the police arrived, the Plaintiff left. *Id.* at 16-17.

On September 18, 2021, the Plaintiff returned to the Library without wearing a mask and sat down at a table. Dkt. 47-1 at 19. Staff approached him and reminded him that he could not be in the library without a mask. *Id.* The Plaintiff began filming the interaction and objected to the Library staff's request that he wear a mask or leave. *Id.* He requested accommodations to use an outlet, restrooms and an isolated temperature controlled room. Dkt. 7 at 14. They discussed various accommodations that the Library offered to patrons who were unable or unwilling to wear a mask. *Id.* at 20. The Plaintiff contends that no one told him that he could use the bathrooms without a mask or use the outside outlets. Dkt. 50 at 5. Library staff eventually called the police and then returned to talk with the Plaintiff to try and get him to comply. Dkt. 47-1 at 19. The Plaintiff refused to wear a mask or leave. *Id.* The police arrived at the Library but left for a while to address a higher priority call. *Id.* at 20-21. The Plaintiff remained at the Library frequently filming himself and staff and refusing to wear a mask or leave. *Id.* The police eventually returned, gave him a trespass warning, and escorted him out. Dkt. 7 at 38.

## B. PROCEDURAL HISTORY

Plaintiff alleges that the Library Defendants violated his rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.* ("ADA") and the Washington Law Against Discrimination, RCW 49.60, *et. seq.* ("WLAD"). Dkt. 7. He requests damages, injunctive relief, and declaratory relief. *Id.*

## C. ORGANIZATION OF OPINION

This opinion will provide the summary judgment standard. It will then address the Library's motion for summary judgment on the Plaintiff's ADA claim and his WLAD claim together.

1

2

## II.   DISCUSSION

### A.  SUMMARY JUDGMENT STANDARD

3

4

5

6

7

8

9

10

11

12

13

14

15

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

16

17

18

19

20

21

22

23

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial, which is a preponderance of the evidence in most civil cases.  *Anderson,* 477 U.S. at 254; *T.W. Elect.,* 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elect.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at

24

255).  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed."  *Lujan v. Nat'l Wildlife Fed*., 497 U.S. 871, 888–89 (1990).

**B.  ADA AND WLAD CLAIMS**

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132.

The Washington corollary, the WLAD, also prohibits discrimination based on a disability. RCW 49.60, *et. seq*. Although the WLAD offers protections "at least as broad" as those offered under the ADA, Washington courts look to federal case law interpreting remedial statutes like the ADA and Title VII "to guide interpretation of the WLAD." *Taylor v. Burlington N. R.R. Holdings Inc*., 904 F.3d 846, 848–49 (9th Cir. 2018)(*quoting Kumar v. Gate Gourmet Inc*., 180 Wash.2d 481, 325 P.3d 193, 197–98 (2014)(*internal quotation marks and footnotes omitted*). Where the Washington Supreme Court has departed from federal antidiscrimination statute precedent, however, it has almost always ruled that the WLAD provides greater protections than its federal counterparts do.  *Id*.  Accordingly, the Plaintiff's disability claims under both the ADA and WLAD will be analyzed together using federal law unless the WLAD differs, which will be specifically noted.

To prove that a public entity violated Title II of the ADA, a plaintiff must first show that: (1) they are a "qualified individual with a disability"; (2) they were either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or were otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of their disability.  *Duvall v. Cnty. of Kitsap*, 260 F.3d

1124, 1135 (9th Cir. 2001). Likewise, under the WLAD, a plaintiff must show that (1) they have

a disability, (2) the defendant is a place of public accommodation, (3) they were discriminated

against "by receiving treatment that was not comparable to the level of designated services

provided to individuals without disabilities by or at the place of public accommodation;" and (4)

their disability was a "substantial factor causing the discrimination." *Fell v. Spokane Transit*

*Auth.*, 128 Wn.2d 618, 637 (1996).

      1.   Individual with a Disability

The ADA defines a "qualified individual with a disability" as:

> An individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). A "disability" is defined as "[a] physical or mental impairment that

substantially limits one or more of the major life activities[.]" 28 C.F.R. § 35.108. "Major life

activities include, but are not limited to: "caring for oneself, performing manual tasks, seeing, . . .

walking, . . . breathing . . ." *Id*.

The Plaintiff has pointed to issues of fact as to whether he has a "physical or mental

impartment that substantially limits one or more life activities." The Plaintiff's statements that

he has asthma, dyspnea (shortness of breath), and feelings of panic are sufficient. He maintains

that these conditions impair his ability to walk more than 20 feet with a mask on, "substantially

limiting" his life activities. While the Library has pointed to evidence to the contrary, there are

issues of fact as to this element of his claims.

      2.   Excluded from, Denied Benefits of, or Discriminated Against by a Public Entity

1    In his Complaint, the Plaintiff claims that he was excluded from, denied the benefits of,

2    or otherwise discriminated against when he was not allowed to use the Library's outlets, an

3    isolated temperature controlled room, and the restroom.

4    The Plaintiff fails to show that any other patron was given access to an isolated

5    temperature controlled room.  Accordingly, he has not shown that he was "excluded from,

6    denied the benefits of, or otherwise discriminated against" when he was not allowed to use one

7    of those rooms.

8    He contends that the Library failed to accommodate his disability so that he could use the

9    outlets and the bathroom.  "The failure to provide reasonable accommodation can constitute

10   discrimination." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 951 (9th Cir. 2017).  In ADA cases,

11   the Plaintiff bears the burden of establishing the "existence of a reasonable accommodation that

12   would enable [them] to participate in the . . . service or activity at issue." *Pierce v. County of*

13   *Orange,* 526 F.3d 1190, 1217 (9th Cir. 2008).  "The public entity may then rebut this by showing

14   that the requested accommodation would require a fundamental alteration or would produce an

15   undue burden." *Id.*

16   The Plaintiff has failed to point to evidence that remaining in the Library without a mask

17   was a reasonable accommodation considering the COVID-19 pandemic.  He contends that the

18   fact that on September 14, 2021, Ms. Froelich allowed him to remain in the Library for an hour

19   without his mask demonstrates that it was a reasonable accommodation. The Plaintiff fails to

20   acknowledge that several staff members approached him during that time and asked him to wear

21   his mask.  In any event, the staff's attempt to resolve the issue by giving him a chance to comply

22   voluntarily for a period of time before calling the police does not mean that remaining without a

23   mask was a reasonable accommodation.

24

1      The Plaintiff maintains that the Library could have accommodated him by allowing him

2 to use one of the isolated temperature controlled rooms so that he could access an outlet and the

3 WIFI.  The Library has shown that his requested accommodation "would require a fundamental

4 alteration or would produce an undue burden."  *Pierce* at 1217.  The Library indicates that the

5 rooms that the Plaintiff inquired about using were being used at the time to social-distance the

6 staff as required under the Washington State Department of Labor and Industry rules and so

7 could not be offered to the Plaintiff or any other patron.  Dkt. 47 at 5.  Staff offices are never

8 open to the public.  *Id.*; Dkt. 52 at 4.  While the Plaintiff argues that the website did not indicate

9 that the rooms were closed, this is not determinative as to whether a room was actually available.

10 The Library has shown that allowing the Plaintiff to be in one of these rooms without a mask

11 would "produce an undue burden" on it.

12      The Plaintiff now argues that the Library could have accommodated him by constructing

13 him a small "fort" with duck-tape and plastic tarping.  Dkt. 49.  The Plaintiff offers no evidence

14 that this is a reasonable accommodation, just his own conjecture.

15      Further, the Plaintiff has failed to show that the Library's offered accommodations were

16 unreasonable as was his burden.  *Duvall* at 1137; *Larson v. Iboshi,* 441 F.App'x 511, 514 ();

17 *Selene v. Legislature of Idaho,* 514 F. Supp.3d 1243, 1257 (D. Idaho 2021).

18      The Library offered to allow the Plaintiff to use its outside outlets which were undercover

19 and still provided access to the WIFI.  Dkt. 47 at 2-3. While the Plaintiff indicates that he was

20 not told of the possibility of using the Library's outside outlets, he also stated that the outlet that

21 he tried did not power his computer properly.  His assertion that he was unaware of the

22 possibility of using the outside outlets is not credible.  There is no evidence that he informed the

23

24

Library that the outlet was not working.  He has failed to show that use of the outside outlets and WIFI access were not a reasonable accommodation.

The Library states that it allowed patrons to use the restrooms without a mask.  The Plaintiff contends that the Library did not tell him about this and when he asked about the bathrooms, he was told that he had to wear a mask in the building.  Aside from the obvious hearsay issues with the Plaintiff's statement, he has not shown that it was not a reasonable accommodation (particularly considering the fact that this is the accommodation he wanted).

The Plaintiff has not pointed to issues of fact that he was excluded from, denied the benefits of, or otherwise discriminated against by the Library.  The barriers of which the Plaintiff complains were brought about by the COVID-19 pandemic and his unwillingness to avail himself of the Library's accommodations.

3.  <u>"By Reason of his Disability" or Disability was a "Substantial Factor"</u>

Assuming, without finding that there are issues of fact as to whether the Library denied the Plaintiff an accommodation "by reason of his disability" under the ADA or that his disability was a "substantial factor causing the discrimination" for purposes of the WLAD, his claims should still be dismissed because the Library has shown that it is entitled to a judgment as a matter of law on its affirmative defense of direct threat.

4.  <u>Affirmative Defense – Direct Threat</u>

At the time of these events, the Library was forced to comply with the Washington State governor's mandatory mask orders and the Washington State Health Department mask orders. While the Plaintiff argues that the ADA preempts the state and county mask orders, the Library Defendants argue that the ADA's affirmative defense of direct threat applies.

"The ADA's direct threat provision stems from the recognition . . . of the importance of prohibiting discrimination against individuals with disabilities while protecting others from significant health and safety risks, resulting, for instance, from a contagious disease." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998).  The ADA's direct threat defense provides:

> Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

42 U.S.C. § 12182 (b)(3).  The WLAD also contains a similar provision.  RCW 49.60.215.

In order to prevail in this defense, the Library "bears a heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others." *Lockett v. Catalina Channel Exp., Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007).  Under the relevant regulations,

> In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 36.208(b).  "[W]hile this determination may not be based on generalizations or stereotypes, the assessment will not usually require the services of a physician, and the public accommodation can consider public health authorities, including the Centers for Disease Control." *See Giles v. Sprouts Farmers Mkt., Inc.*, 2021 WL 2072379, at *5 (S.D. Cal. May 24, 2021)(*citing* ADA Title III Technical Assistance Manual § III-3.8000).  The CDC considered unmasked adults at indoor places of public accommodation a direct threat to the health and safety of others.  *Hernandez* at 6.

1       The Library has shown that allowing the Plaintiff to enter and remain in the Library

2   without a mask "pose[d] a direct threat to the health or safety of others."  It made an

3   individualized assessment that a Library patron, such as the Plaintiff, who entered without a

4   mask during the pandemic, posed such a risk.  The Library Defendants have shown that the

5   decision was based on the medical knowledge at the time.  They have demonstrated that, based

6   on the best available objective knowledge the nature, duration, and severity of the risk was

7   significant.  The Library Defendants have shown that there was a probability that the potential

8   injury actually occured.  Further, the Library Defendants have demonstrated that there were no

9   other reasonable modifications of the masking policy (that were not already in place) that would

10  have mitigated the risk.  The Library's denial of the Plaintiff's access to the premises did not

11  constitute discrimination under the ADA or WLAD.  *See Witt v. Bristol Farms*, 2021 WL

12  5203297, at *5 (S.D. Cal. Nov. 9, 2021), appeal dismissed, 21-56331, 2022 WL 726961 (9th Cir.

13  Jan. 14, 2022))(holding that "as long as a public entity accused of disability discrimination

14  conducted an individualized assessment of whether an individual poses a direct threat—

15  not based on generalized stereotypes, but based on reasonable judgment grounded in medical

16  knowledge and public health authorities, and based on consideration of reasonable

17  modifications—denying that individual access to the premises does not constitute discrimination

18  under the ADA").  The Library has shown that there are no issues of fact and it is entitled to a

19  judgment as a matter of law on the direct threat defense.

20          5.  Conclusion

21      The Library's motion should be granted.  The Plaintiff's claims for violations of the ADA

22  and WLAD against the Library should be dismissed.  All claims now being resolved, this case

23  should be closed.

24

1

### III.   <u>ORDER</u>

2

Therefore, it is hereby **ORDERED** that:

3

- Defendant Timberland Regional Library's Motion for Summary Judgment (Dkt.

4

  45) **IS GRANTED**; and

5

- This case **IS CLOSED**.

6

The Clerk is directed to send uncertified copies of this Order to all counsel of record and

7

to any party appearing pro se at said party's last known address.

8

Dated this 14th day of December, 2022.

9

10

ROBERT J. BRYAN
United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 14